Citation Nr: 1714092 
Decision Date: 04/28/17 Archive Date: 05/05/17

DOCKET NO. 10-02 185 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Winston-Salem, North Carolina


THE ISSUES

1. Entitlement to a disability rating in excess of 10 percent for right knee post-operative residuals, including a ruptured right quadriceps and tendons, Muscle Group (MG) XIV (right knee disability). 

2. Entitlement to an initial disability rating in excess of 30 percent for adjustment disorder with mixed emotional features (adjustment disorder).

3. Entitlement to a total disability rating based upon individual un-employability (TDIU), to include on an extra-scheduler basis under 38 C.F.R. § 4.16(b).


REPRESENTATION

Veteran represented by: Mark P. Henriques, Attorney



WITNESS AT HEARING ON APPEAL

Veteran


ATTORNEY FOR THE BOARD

P.S. McLeod, Associate Counsel


INTRODUCTION

The Veteran served on active duty from July 1986 to July 1990. 

This case comes before the Board of Veterans' Appeals (Board) on appeal from a January 2009 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Winston-Salem, North Carolina.

In April 2012, the Veteran testified at a video conference hearing before an Acting Veterans Law Judge (VLJ). A transcript of this hearing was prepared and associated with the record. In July 2012, the Acting VLJ who had presided over the hearing remanded the Veteran's claims for additional development.

In July 2015, the Veteran was notified that the Acting VLJ who had conducted his April 2012 hearing was no longer employed by the Board, and he was offered the opportunity to testify at another Board hearing. He accepted this offer in a response that was received by VA in August 2015. The Board remanded this claim in September 2015 and the Veteran testified before the undersigned VLJ in December 2015. A transcript of this hearing was prepared and associated with the record.

The issues of entitlement to a disability rating in excess of 10 percent for right knee disability and entitlement to TDIU are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDING OF FACT

1. The evidence of record reveals that the Veteran has occupation and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks.


CONCLUSION OF LAW

1. The criteria for a disability rating in excess of 30 percent for service-connected adjustment disorder with mixed emotional features have not been met for the period on appeal. 38 U.S.C.A. §§ 1155, 5107; 38 C.F.R. §§ 4.321, 4.130, Diagnostic Code 9440 (2016) (Code).


REASONS AND BASES FOR FINDING AND CONCLUSION

I. Duties to Notify and Assist

With respect to the Veteran's claim herein, VA has met all statutory and regulatory notice and duty to assist provisions. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326 (2016); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015).

The RO obtained and associated with the record VA Vocational Rehabilitation records. In July 2016 the examiner who conducted the May 2015 VA examination provided the addendum opinion requested by the Board in the prior remand. Therefore, the RO's actions have complied with the remand instructions. Stegall v. West, 11 Vet. App. 268 (1998).

II. Higher Evaluation

Disability evaluations are determined by the application of a schedule of ratings which is based on average impairment of earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. Separate diagnostic codes identify the various disabilities. Disabilities must be reviewed in relation to their history. 38 C.F.R. § 4.1. Other applicable, general policy considerations are: interpreting reports of examination in light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability, 38 C.F.R. § 4.2; resolving any reasonable doubt regarding the degree of disability in favor of the claimant, 38 C.F.R. § 4.3; where there is a question as to which of two evaluations apply, assigning a higher of the two where the disability picture more nearly approximates the criteria for the next higher rating, 38 C.F.R. § 4.7; and, evaluating functional impairment on the basis of lack of usefulness, and the effects of the disabilities upon the person's ordinary activity, 38 C.F.R. § 4.10. See Schafrath v. Derwinski, 1 Vet. App. 589 (1991). Staged ratings are appropriate in any increased-rating claim in which distinct time periods with different ratable symptoms can be identified. Hart v. Mansfield, 21 Vet. App. 505 (2007). 

When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant. 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

The Board has reviewed all of the evidence in the Veteran's claims file, with an emphasis on the evidence relevant to this appeal. Although the Board has an obligation to provide reasons and bases supporting this decision, there is no need to discuss, in detail, the extensive evidence of record. Indeed, the Federal Circuit has held that the Board must review the entire record, but does not have to discuss each piece of evidence. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000). Therefore, the Board will summarize the relevant evidence where appropriate, and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the claims.

The Veteran seeks entitlement to a higher evaluation for an adjustment disorder. The Veteran's psychiatric condition is evaluated pursuant to Code 9440. 38 C.F.R. § 4.130. 

Under Code 9440, a 50 percent rating is assigned when there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships. 

A 70 percent rating is assigned when the psychiatric condition produces occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); inability to establish and maintain effective relationships. 

A maximum 100 percent rating is assigned when there is total occupational or social impairment due to such symptoms as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place, memory loss for names of close relatives, own occupation, or own name. 

When determining the appropriate disability evaluation to assign, the Board's primary consideration is a veteran's symptoms, but it must also make findings as to how those symptoms impact a veteran's occupational and social impairment. Vazquez-Claudio v. Shinseki, 713 F.3d 112 (Fed. Cir. 2013); Mauerhan v. Principi, 16 Vet. App. 436, (2002). Because the use of the term "such as" in the rating criteria demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, the Board need not find the presence of all, most, or even some, of the enumerated symptoms to award a specific rating. Id. at 442; see also Sellers v. Principi, 372 F.3d 1318 (Fed. Cir. 2004). Nevertheless, all ratings in the general rating formula are also associated with objectively observable symptomatology and the plain language of the regulation makes it clear that the veteran's impairment must be "due to" those symptoms, a veteran may only qualify for a given disability rating by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio, 713 F.3d at 118.

Psychiatric examinations frequently include assignment of a Global Assessment of Functioning (GAF) score, which is defined by DSM-V as number between zero and 100 percent, that represents the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health illness. Higher scores correspond to better functioning of the individual. The GAF score and the interpretations of the score are important considerations in rating a psychiatric disability. See, e.g., Richard v. Brown, 9 Vet. App. 266, 267 (1996); Carpenter v. Brown, 8 Vet. App. 240 (1995). However, the GAF scores assigned in a case, like an examiner's assessment of the severity of a condition, are not dispositive of the rating issue; rather, the GAF score must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a).

GAF scores ranging between 81 and 90 reflect absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994).

GAF scores ranging between 71 and 80 reflect that if symptoms are present they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). Id.
GAF scores ranging from 61 to 70 reflect some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships. Id.

GAF scores ranging from 51 to 60 reflect more moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers). Id.

October 2006 VA Vocational Rehabilitation records indicate that a social work assessment was conducted which indicated the Veteran reported depressed mood, diminished interest in activities, fatigue, as well as feelings of worthlessness and guilt. Substance abuse and dependency were noted and a GAF score of 50 was assigned. Recommendations for treatment were limited to educational and support courses for issues relating to alcohol and narcotics abuse.

VA treatment records indicate that the Veteran was assessed with a likely adjustment disorder in March 2008. The Veteran was afforded a VA examination in September 2008 which confirmed the Veteran's diagnosis with an adjustment disorder, "as a result of difficulties with his right knee." The Veteran appeared at this examination to be oriented alert and cooperative. He was not working because of his knee; had a few friends and attended church. His mood was a bit tense but cooperative and friendly. His affect was appropriate. His thought process and communication were clear and unimpaired; there was no indication of homicidal/suicidal thoughts or hallucinations. Insight and judgment appeared to be adequate. The examiner opined that the Veteran's adjustment disorder was secondary to his right knee disability and manifested itself with symptoms of irritability, depression, anxiety, and sleep impairment. The Veteran's GAF score at the time of the examination was 55. No issues with long or short-term memory were noted and general affect was appropriate. 

In July 2012 the Board remanded the claims for further development including a request for a new VA examination for the Veteran's adjustment disorder claim. VA medical records from December 2013 indicate that the Veteran presented with no issues with mood or depression.

The Veteran was provided a VA examination pursuant to the Board's July 2012 remand in June 2015. The examination included a review of the record, mental status examination and neuropsychological evaluation. That examiner opined that the Veteran continues to suffer from Adjustment Disorder difficulties predominated by intermittent periods of depressed mood in response to the constant stressor of his lower extremity injury and associated pain. The Veteran was married, but had been separated from his wife for 13 plus years. He was currently homeless, living with relatives or a girlfriend. On mental status examination, there were no notable objective memory impairments in auditory-verbal or visual learning, recall and recognition skills. The Veteran's memory abilities for both visual and verbal materials were generally in the below average to average performance range; however, the examiner considered the Veteran's estimated premorbid functioning capacities (e.g., below to low average) and found the relative weaknesses are less likely than not to reflect significant decline or change from premorbid functioning levels. It was specifically noted that the Veteran was likely misconstruing difficulties with concentration as memory loss. Depressive episodes, which the examiner characterized as of low-level severity, were indicated and noted to be attributable to periods of pain associated with the Veteran's right knee and ruminations about the loss of function he has sustained due to his right knee disability. Anxiety was noted not to be a prevalent issue for the Veteran. There was some indication of suspiciousness although the examiner attributed this to the Veteran's criminal history. The Veteran noted recurrent sleep impairment most often occurring in conjunction with disturbances in his mood. He claimed his average sleep ranges from four to five hours per night. Panic attacks, delusions or hallucinations, and issues with personal hygiene were all found not to be factors affecting the Veteran. Judgement, speech, and thought processes were found to be consistent with the levels the Veteran functioned at prior to the onset of his adjustment disorder. 

The examiner commented that the Veteran's depressed mood likely causes intermittent mild issues with attention/concentration, but no objective indication of current attention impairment was found on evaluation/neuropsychological assessment. His adjustment disorder condition would not reasonably cause problems in impulse control or gross thought processes 

The examiner opined that the Veteran's adjustment disorder is associated with intermittent periods of depressed mood and associated symptoms that are overall mild in severity and functional impact. He may experience greater mood decline for less frequent periods, but the bulk of his mood problems are mild in overall severity and functional impact. This level of symptom severity and functional impact, due to the psychiatric condition to the exclusion of his lower extremity physical issues that are the stressor upon which his adjustment disorder diagnosis is based, would put the Veteran's GAF score in the 61 to 70 range, consistent with the DSM-IV guidelines for GAF scores as "Some mild symptoms ......but generally functioning pretty well, has some meaningful interpersonal relationships." The adjustment disorder would reasonably only cause intermittent and mild occupational task difficulties. His mood decline would reasonably produce mild apathy, anger/irritability, attention/concentration problems, fatigue, and interpersonal strain that likely could cause a reduction in work efficiency, but less likely to cause the inability to engage in various physical tasks or repetitive assembly line work (such as what he engaged in his past work history). 

Pursuant to the most recent Board remand, the same examiner reviewed the record, including recently obtained vocational rehabilitation records, and provided an addendum opinion in July 2016. With regard to the possible occupational limitations based solely on the Veteran's service-connected adjustment disorder, the examiner noted that the Veteran's general ability results are attributable to his premorbid intellectual and academic functioning capacities and not his service-connected adjustment disorder. The opinion further provides that the Veteran has relative strengths in his cognitive processing speed and working memory capacity, which would be indicative of the Veteran's ability to adequately concentrate on work related tasks. The author further noted that any impact on cognition attributable to the Veteran's adjustment disorder would more likely than not manifest as a mild effect on the Veteran's concentration and attention capabilities. As stated above, these capabilities were found to be relative strengths for the Veteran. Therefore, the author opined that the Veteran's concentration and attention capabilities would only be mildly reduced during a flare-up of the Veteran's adjustment disorder symptoms. Additional mild effects on the Veteran's capabilities were attributed to the Veteran's reported sleep deficiencies. 

Based a review of the complete record, the Board finds that entitlement to an initial evaluation in excess of 30 percent for the Veteran's adjustment disorder is not warranted. 

During the course of the appeal the Veteran's adjustment disorder has been manifested by decreased sleep, concentration issues, and depressive episodes. The Veteran has not been found to have issues with memory loss, hallucinations, delusions, suicidal thoughts, panic attacks, or personal hygiene or otherwise with symptoms of similar severity, frequency or duration as those contemplated by a 50 percent rating. The Veteran's affect has been appropriate, never flattened, and the Veteran has presented as alert and cooperative during his appearances before VA providers and examiners.

In the Veteran's September 2008 VA examination the examiner assigned a GAF score of 55. However, as stated above, the GAF scores assigned in a case, like an examiner's assessment of the severity of a condition, are not dispositive of the rating issue; rather, the GAF score must be considered in light of the actual symptoms of the Veteran's disorder, which provide the primary basis for the rating assigned. See 38 C.F.R. § 4.126(a). The July 2012 VA examination provides a GAF score between 61 and 70. The symptoms of the Veteran's adjustment disorder are consistent between the September 2008 and July 2015 VA examinations, therefore the GAF scores of the VA examinations alone are less probative evidence of the severity of the Veteran's adjustment disorder.

The actual symptoms of the Veteran's disorder are appropriately characterized as having a mild impact on his social and occupational functioning as they consistently manifest as episodic depression, sleep deficiency, and concentration issues. The June 2015 examiner conducted extensive testing and evaluation and characterized the Veteran's overall impairment as mild in severity and functional impact. The July 2016 addendum opinion found that the Veteran's adjustment disorder symptoms resulted in a mild reduction of his concentration and attention capabilities during periods of fare-ups, while the Veteran's specific sleep deficiencies contributed a separate mild impact on these capabilities. 

Although the Veteran is not working, the evidence does not show that the symptoms of his service-connected psychiatric disability result in reduced reliability and productivity. Thus, as the Veteran's symptoms during the period on appeal, were mild at most, entitlement to an evaluation in excess of 30 percent disabling is not warranted.

The Board finds that referral for extraschedular consideration is not warranted. A comparison between the level of severity and symptomatology and degree of occupational and social impairment of the Veteran's adjustment disorder with the schedular rating criteria reflects that the diagnostic criteria reasonably describe the Veteran's disability level (social and occupational impairment) and symptomatology. All the impairment and symptoms are either explicitly part of the schedular rating criteria or are "like or similar to" examples or symptoms in the schedular rating criteria. Mauerhan, 16 Vet. App. at 443. For these reasons, the Veteran's service-connected adjustment disorder has not been shown to be productive of an exceptional disability picture. Thus, further consideration of referral for an extraschedular consideration is not required. See Thun v. Peake, 22 Vet. App. 111 (2008).

Finally, the Board notes that the Veteran is also service-connected for other disabilities and the Board is remanding a claim for increased rating for the right knee as well as claim for TDIU for further development. Thus, the Veteran and his representative have the opportunity to explicitly raise the issue of whether referral for extraschedular consideration is warranted for the Veteran's disabilities on a collective basis as part of the remanded claims for increased rating. Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014); Yancy v. McDonald, 27 Vet. App. 484 (2016).


ORDER

Entitlement to an initial disability rating in excess of 30 percent for adjustment disorder with mixed emotional features is denied.


REMAND

I. Right Knee Disability

The nature of the service-connected right knee disability is unclear. In a November 2002 rating decision, service connection was initially granted for residuals of a right knee injury. The disability was evaluated under 38 C.F.R. § 4.71a, Diagnostic Code 5010 (for arthritis). 

In a September 2003 rating decision, the RO granted a separate 10 percent rating for post-operative ruptured right quadriceps and tendons, muscle group XIII, under 38 C.F.R. § 4.73, Code 5313. In that same decision, the RO changed the right knee disability rating to fall under Diagnostic Code 5010-5256 and increased the rating to 60 percent. 

In a June 2006 rating decision (which following a December 2005 rating decision that proposed a reduction), the RO characterized the service-connected disability as "status postoperative residuals right knee injury with post-operative ruptured right quadriceps and tendons Muscle Group XIV" and reduced the rating from 60 to 10 percent under Diagnostic Code 5101-5256. The separate rating for injury to Muscle Group XIII was discontinued. 

Veteran's right knee disability is currently still assigned a rating under 38 C.F.R. 4.71a, Code 5010-5256. Hyphenated diagnostic codes are used when a rating under one diagnostic code requires the use of an additional diagnostic code to identify the basis for the evaluation assigned; the additional code is shown after the hyphen. 38 C.F.R. § 4.27. The hyphenated diagnostic codes may be read to indicate that arthritis is the service-connected disorder, and it is rated analogous to ankylosis of the knee. However, the Veteran has not had ankylosis of the knee at any time during the period on appeal. Furthermore, this combined rating purports to include the Veteran's injury to muscle group XIV.

In December 2015 the Veteran was provided a VA Compensation and Pension examination for his right knee disability pursuant to his claim for an increased rating. The examiner performed tests on both the muscle and orthopedic components of the Veteran's knee. That examination and opinion are considered inadequate under 38 C.F.R. § 4.59. See Correia v. McDonald, 28 Vet. App. 158 (2016). 

The examination also indicates that both muscle groups XIII and XIV are affected, but only Muscle Group XIV is considered in the current rating. Further examination is necessary to determine the extent of the service-connected disability. 

Newly submitted VA outpatient medical records have been associated with the claims file. Specifically a January 2017 orthopedic surgery outpatient note concerning the Veteran's service-connected right knee disability is now of record. On remand the Board directs the examiners attention to the findings and opinion of the doctor who authored this note. 

II. TDIU

The Veteran's Vocational Rehabilitation records note that the Veteran's highest level of education is graduation from high school. Prior work history documented in these records shows a pattern of manual labor based work. Vocational Rehabilitation records also note the Veteran's legal history which is supported by evidence of record, including a felony conviction and periods of incarceration. A May 2015 VA examination provided that the Veteran's service-connected right knee disability has an impact on his ability to perform physical occupational tasks, but not sedentary. In the December 2015 hearing before the undersigned the Veteran testified that he had not had gainful employment in the previous 15 years, specifically he has not been able to pass the required physicals, due to his knee, to be hired as a permanent employee. 

Pursuant to the Board's February 2015 remand the Veteran was provided a VA examination in July 2016. The examiner opined that the Veteran's criminal record has limited his occupational choices to labor based positions. As documented by the record the Veteran's service-connected knee disability makes him incompatible with labor based work. 

Total disability ratings for compensation may be assigned, where the scheduler rating is less than total, when the disabled person is, in the judgment of the rating agency, unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities, provided that, if there is only one such disability, this disability shall be ratable at 60 percent or more, and that, if there are two or more disabilities, there shall be at least one disability ratable at 40 percent or more, and sufficient additional disability to bring the combined rating to 70 percent or more. 38 C.F.R. § 4.16(a).

The evidence of record indicates that the Veteran is currently limited to labor-based employment to which he is incompatible due to his service-connected knee disability. However, during the period on appeal the Veteran has not met the minimum percentage requirements for a TDIU set forth in 38 C.F.R. § 4.16(a). Even when the percentage requirements of 38 C.F.R. § 4.16(a) are not met, a TDIU may be granted on an extrascheduler basis in exceptional cases when the Veteran is unable to secure and follow a substantially gainful occupation by reason of service connected disability. 38 C.F.R. § 4.16(b). The Board cannot award TDIU on this basis in the first instance. Bowling v. Principi, 15 Vet. App. 1, 10 (2001). Thus, the matter of entitlement to a TDIU must be submitted to the Director of the Compensation and Pension Service for extrascheduler consideration.

Accordingly, the case is REMANDED for the following action:

1. Obtain and associate with the claims file VA treatment records regarding the Veteran dated since January 2017. Any additional pertinent records identified by the appellant during the course of the remand should also be obtained, following the receipt of any necessary authorizations from the appellant, and associated with the claims file.

2. After completion of the foregoing ,schedule the Veteran for appropriate examinations to determine the current severity of his right knee disability. The claims file and copies of all pertinent records should be made available to the examiner for review. All indicated testing should be conducted. The examiner is requested to delineate all symptomatology associated with, and the current severity of, the right knee disability, including the separate effects of the disability attributable to the right leg muscle group XIII and XIV and the right knee joint. The appropriate Disability Benefits Questionnaires (DBQs) should be filled out for this purpose, if possible. The examiners must test the range of motion in active motion, passive motion, weight-bearing, and non-weightbearing, for both the joint in question and any paired joint. If the examiners is unable to conduct the required testing or concludes that the required testing is not necessary in this case, he or she should clearly explain why that is so. The examiners must also provide an opinion as to which muscle group is affected and contributing to the veteran's current service-connected right knee disability.

3. Refer the Veteran's claim of entitlement to a TDIU to the Under Secretary for Benefits or the Director of Compensation and Pension Services for consideration of assignment of a TDIU on an extrascheduler basis.

4. Thereafter, readjudicate the claim, with consideration of which muscle groups are associated with the right knee disability. If the benefit sought on appeal remains denied, the Veteran and his representative should be furnished a supplemental statement of the case and an appropriate period of time to respond.

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
M.E. LARKIN
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs